[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Electronic Classroom of Tomorrow v. Ohio Dept. of Edn.,* Slip Opinion No. 2018-Ohio-3126.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-3126

ELECTRONIC CLASSROOM OF TOMORROW, APPELLANT, *v.* OHIO DEPARTMENT OF EDUCATION, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Electronic Classroom of Tomorrow v. Ohio Dept. of Edn.,* Slip Opinion No. 2018-Ohio-3126.]

*Education—Community schools—Funding of internet- or computer-based community schools ("e-schools")— Ohio Department of Education has authority under R.C. 3314.08 to base funding of an e-school on the duration of student participation—E-schools may be required to provide data documenting the duration of a student's participation—Judgment affirmed.*

(No. 2017-0913—Submitted February 13, 2018—Decided August 8, 2018.)

APPEAL from the Court of Appeals for Franklin County,

No. 16AP-863, 2017-Ohio-5607.

_____

**FISCHER, J.**

**{¶ 1}** In this discretionary appeal, we address whether R.C. 3314.08 authorizes defendant-appellee, the Ohio Department of Education ("ODE"), to base funding of an Internet-based community school, or e-school, on the duration of student participation. We hold that it does, as the statute is unambiguous and allows ODE to seek that data in order to calculate funding.

## I. Factual Background and Procedural Posture

**{¶ 2}** Plaintiff-appellant, the Electronic Classroom of Tomorrow ("ECOT"), is Ohio's largest e-school and has been in operation since 2000.

**{¶ 3}** Under R.C. 3314.08(C)(1), funding for community schools, which are commonly known as charter schools, is determined "on a full-time equivalency ['FTE'] basis for each student enrolled." R.C. 3314.08(H)(3) sets forth how FTE is measured:

> The department shall determine each community school student's percentage of full-time equivalency based on the percentage of learning opportunities offered by the community school to that student, reported either as number of hours or number of days, is [sic] of the total learning opportunities offered by the community school to a student who attends for the school's entire school year. However, no internet- or computer-based community school shall be credited for any time a student spends participating in learning opportunities beyond ten hours within any period of twenty-four consecutive hours. Whether it reports hours or days of learning opportunities, each community school shall offer not less than nine hundred twenty hours of learning opportunities during the school year.

A community school reports its data to ODE, and ODE then determines the amount of public funding the school will receive based on the figures that are reported.

{¶ 4} Under R.C. 3314.08(K), ODE is authorized to review a community school's data and to adjust a school's funding (by reducing or increasing future funding, as appropriate) based on the result of its review. In an effort to make the reviews consistent throughout the state, ODE provides reviewers with a review manual, or handbook. ODE publishes the handbook on its website and frequently revises it.

{¶ 5} ODE typically conducts reviews on a five-year cycle for each community school, unless matters arise warranting a review sooner. ECOT's last review occurred in 2011. ECOT was therefore due for a regularly scheduled review in 2016.

{¶ 6} For the 2015-2016 academic year, ECOT reported more than 15,000 enrolled students and received more than $106 million in public funding from ODE. During the preliminary stage of its review, ODE requested that ECOT submit data to demonstrate the duration and frequency of students' participation (i.e., log-on and log-off times) in ECOT's online educational programs.

{¶ 7} In response to ODE's request, ECOT provided log-on/log-off records showing that, on average, its students spent approximately one hour per day logged on to ECOT's online educational platform. ODE continued to request data from ECOT showing the duration of a student's participation for the final FTE review. However, ECOT did not comply with ODE's request.

{¶ 8} Instead, on July 8, 2016, ECOT sought a permanent injunction and declaratory judgment in the Franklin County Court of Common Pleas seeking to bar ODE from requesting or considering data showing the duration of a student's participation during its review. The trial court ultimately denied ECOT's claims against ODE, and the Tenth District Court of Appeals affirmed the trial court's judgment.

**{¶ 9}** ECOT appealed. On September 13, 2017, we accepted review of ECOT's fourth proposition of law, which argues that ODE is barred by the language of R.C. 3314.08 from calculating funding based on a student's participation.

## II. Analysis

**{¶ 10}** First, ECOT argues that the Tenth District erred when it held that R.C. 3314.08(H)(3) unambiguously "compels the conclusion that although enrollment is a necessary predicate to funding, the amount of funding per student is dependent on a measure of student participation." 2017-Ohio-5607, ¶ 25. ECOT agrees that the statute is unambiguous, but in its view, R.C. 3314.08 demonstrates the legislative intent that funding for community schools is based on enrollment, not on the duration of student participation.

### A. Standard of review

**{¶ 11}** We review questions of statutory interpretation de novo. *Ceccarelli v. Levin*, 127 Ohio St.3d 231, 2010-Ohio-5681, 938 N.E.2d 342, ¶ 8. When considering the meaning of a statute, our " 'paramount concern is the legislative intent' of its enactment." *State ex rel. Steffen v. First Dist. Court of Appeals*, 126 Ohio St.3d 405, 2010-Ohio-2430, 934 N.E.2d 906, ¶ 30, quoting *State ex rel. Steele v. Morrissey*, 103 Ohio St.3d 355, 2004-Ohio-4960, 815 N.E.2d 1107, ¶ 21. Because a statute must be considered as a whole, "a court cannot pick out one sentence and disassociate it from the context, but must look to the four corners of the enactment to determine the intent of the enacting body." *State v. Wilson*, 77 Ohio St.3d 334, 336, 673 N.E.2d 1347 (1997). When considering the four corners of an enactment, we "consider the statutory language in context, construing words and phrases in accordance with rules of grammar and common usage." *State Farm Mut. Auto. Ins. Co. v. Grace*, 123 Ohio St.3d 471, 2009-Ohio-5934, 918 N.E.2d 135, ¶ 25. Provided that "[t]he meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary." *State ex*

*rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545, 660 N.E.2d 463 (1996).

### B. R.C. 3314.08 is unambiguous

{¶ 12} "Community schools" are public schools that are "independent of any school district." R.C. 3314.01(B). R.C. Chapter 3314 governs community schools, including setting forth a formula for calculating public funding for those schools. R.C. 3314.08(C)(1) first states that ODE is obligated to pay a community school "on a full-time equivalency basis, for each student enrolled."

{¶ 13} R.C. 3314.08(H) then states that ODE "shall adjust the amounts subtracted and paid under division (C) of this section to reflect any enrollment of students in community schools *for less than the equivalent of a full school year*." (Emphasis added.) A student is "enrolled" on the later of two dates: (1) on which "the school both has received documentation of the student's enrollment from a parent *and the student has commenced participation in learning opportunities*" or (2) 30 days before a student is entered into a management system that is established according to statute. (Emphasis added.) R.C. 3314.08(H)(2). The term "learning opportunities" must be defined in the sponsor contract, which must describe both classroom-based and non-classroom-based learning opportunities and must "be in compliance *with criteria and documentation requirements for student participation*" established by ODE. (Emphasis added.) *Id.*

{¶ 14} But it is in R.C. 3314.08(H)(3) that FTE is explained; it is the percentage calculated by dividing the learning opportunities offered by the community school to one student by the total learning opportunities offered by the community school to a student who attends the school for an entire year. The calculation can be made based on either a number of hours or a number of days. However, an e-school cannot be credited for any time a student spends participating in learning opportunities beyond 10 hours within a 24-consecutive-hour period. By stating that the maximum daily credit for each student is ten hours, it is apparent

that the legislature intended that an e-school will be credited for a student's participation for less than ten hours in a day. This calculation can be made only by referring to records that contain evidence of the duration of a student's participation in learning opportunities.

{¶ 15} As ODE notes, the plain meaning of R.C. 3314.08 is confirmed by the language used in R.C. 3314.27. That statute provides:

> No student enrolled in an internet- or computer-based community school may participate in more than ten hours of learning opportunities in any period of twenty-four consecutive hours. Any time such a student participates in learning opportunities beyond the limit prescribed in this section shall not count toward the annual minimum number of hours required to be provided to that student as prescribed in division (A)(11)(a) of section 3314.03 of the Revised Code.
>
> Each internet- or computer-based community school shall keep an accurate record of each individual student's participation in learning opportunities each day. The record shall be kept in such a manner that the information contained within it easily can be submitted to the department of education, upon request by the department or the auditor of state.

{¶ 16} Because the language of R.C. 3314.08 is unambiguous, we need not look beyond its four corners for meaning. The legislature prescribed that student participation is the relevant measure for calculating the public funding of e-schools.

*C. ECOT's arguments are unavailing*

{¶ 17} To support its contrary interpretation of R.C. 3314.08, ECOT makes a variety of arguments. We respectfully reject each of them as not persuasive.

1. R.C. 3314.08 does not articulate an enrollment-based funding methodology

{¶ 18} ECOT argues that R.C. 3314.08(C)(1), which states that payment is made "for each student enrolled in a community school established under this chapter," requires ODE to fund a community school based on the number of students enrolled. However, R.C. 3314.08(C)(1) is only the starting point for calculating payments to community schools. ECOT's argument fails to acknowledge other language in that statute: payment is based "on a full-time equivalency basis, for each student enrolled in a community school." Thus, ODE is required to calculate FTE for each student enrolled in a community school. For these reasons, ECOT's reliance on R.C. 3314.08(C) is misplaced.

{¶ 19} ECOT also points to the legislature's use of the words "enrolled" and "enrollment" in R.C. 3314.08(B) to argue that enrollment is the relevant factor in calculating payments to community schools, but that division of the statute merely requires the state board of education to adopt rules for local boards of education and the governing authority of each community school to annually report the number of students enrolled; it does not address funding. While ECOT spends considerable time discussing other divisions of the community-school statute, it is R.C. 3314.08(H) that requires that ODE adjust funding for community schools by calculating FTE for each student.

{¶ 20} ECOT also argues that R.C. 3314.08(H)(2) plainly provides that ODE's obligation to fund, and to adjust funding, is based on the commencement and termination of a student's enrollment. But the termination of enrollment is merely one reason for ODE to adjust payments; ODE may adjust a school's funding for other reasons. Enrollment creates the *potential* for funding, but the *amount* of funding and any adjustments to it are to be calculated based on a student's participation on a "full-time equivalency basis," R.C. 3314.08(C)(1). In order to calculate funding, ODE is authorized to consider evidence of the duration of a student's participation.

{¶ 21} Second, ECOT contends that the language in R.C. 3314.08(H)(2) requiring a sponsor's contract to "be in compliance with criteria and documentation requirements for student participation" established by the ODE does not mean that a duration- or participation-based standard is to be used to determine funding. ECOT argues that ODE never established standards based on the duration of a student's participation in learning opportunities or even established standards in the enrollment context. ECOT also argues that ODE failed to enact administrative rules under R.C. Chapter 119 setting forth minimum standards for participation. These arguments were rejected by the trial and appellate courts, and we did not accept review of ECOT's proposition of law addressing these issues. Accordingly, they are not properly before us, and we will not address them.

{¶ 22} Third, ECOT argues that R.C. 3314.08(H)(3) plainly "sets forth an enrollment-based equation" for calculating FTE. ECOT claims that the phrase "learning opportunities offered by the community school" indicates that the FTE formula is based on the opportunities offered or made available to a student, not on the hours a student participates in the learning opportunities offered by the school. But R.C. 3314.08(H)(3) refers to "learning opportunities offered by the community school to a student who attends for the school's entire school year." The statute explicitly contemplates both that an e-school offer the learning opportunities and that a student attend and participate in those opportunities. The term "offer" is only one word of the operable language of the statute, which when read in full, does not indicate that the legislature intended for e-schools to be funded merely for *offering* learning opportunities. Accordingly, this argument fails to support ECOT's proposed interpretation of R.C. 3314.08(H)(3).

2. ECOT's interpretation renders null other portions of R.C. 3314.08

{¶ 23} ECOT asserts that on its face, the statutory formula is designed to calculate the percentage of funding to which community schools are entitled for a student who is enrolled for part of a year. ECOT claims that the calculation hinges

on the school's calendar, during which at least 920 hours of learning opportunities must be offered. But this interpretation fails to give effect to R.C. 3314.08(H)(3), which limits the credit given for time a student participates in learning opportunities to ten hours a day. ECOT's interpretation thus would render portions of the statute superfluous. *See Stolz v. J & B Steel Erectors, Inc.*, 146 Ohio St.3d 281, 2016-Ohio-1567, 55 N.E.3d 1082, ¶ 9 ("When a court interprets the meaning of a statute, * * * the court must give effect to all of the statute's words"). We agree with ODE that if the length of a student's enrollment were the only measure of FTE, that student's daily participation hours would not be relevant to whether a school could claim full FTE credit, and thus obtain full funding, for that student. There would be no need for a statutory mechanism to prevent overclaiming—an e-school would not be able to overclaim FTE funding even if it violated the statutory limit to ten hours per day.

3. The 105-hour rule does not support ECOT's interpretation

{¶ 24} ECOT also relies on R.C. 3314.03(A)(6), which the parties describe as the "105-hour rule," to support its enrollment-based-funding interpretation of R.C. 3314.08(H). R.C. 3314.03 provides:

> (A) Each contract entered into between a sponsor and the governing authority of a community school shall specify * * *
> * * *
> (6) * * *
> (b) A requirement that the governing authority adopt an attendance policy that includes a procedure for automatically withdrawing a student from the school if the student without a legitimate excuse fails to participate in one hundred five consecutive hours of the learning opportunities offered to the student.

Another version of the 105-hour rule appears at the end of R.C. 3314.08(H)(2), which provides that a student who completed the prior school year in an internet- or computer-based community school is considered enrolled in the same school in the following school year unless the student, without a legitimate reason, fails to participate in the first 105 consecutive hours of learning opportunities offered in the new school year.

**{¶ 25}** ECOT argues that under ODE's interpretation that an e-school would not receive funding for any period in which a student was enrolled but not participating, the requirement that a student is deemed withdrawn if he fails to participate in 105 consecutive hours of learning opportunities is superfluous. But R.C. 3314.03 and 3314.08(H)(2)(c) address only enrollment, which is the first step necessary to obtain funding. These statutes define the period for which FTE is to be calculated; they do not explain how FTE is to be calculated.

4. The meaning of R.C. 3314.08 is not dependent on ODE's past practice

**{¶ 26}** ECOT also argues that in the past, ODE did not require evidence of the duration of student participation in calculating an e-school's funding. ECOT maintains that prior to 2016, ODE based funding on annual enrollment rather than on student participation and instructed the Ohio Auditor of State's office to conduct its audits accordingly. ECOT contends that ODE should be held to its past practice.

**{¶ 27}** ECOT's contention is unconvincing. The trial court specifically found that "since at least 2010, the FTE review manuals have supported ODE's ability to request and review durational data in connection with FTE funding reviews." Even though ODE did not request data documenting student participation in the past, the *statute* allows ODE to use this data to calculate a community school's funding.

**{¶ 28}** ODE readily admits that it did not realize until 2013 that there was a lack of evidence of student participation. Upon conducting reviews at several community schools, ODE began to question the schools' methods of measuring

10

student participation. From that point forward, ODE requested data measuring the duration of student participation from all community schools, including e-schools, and imposed funding consequences when a community school failed to prove student participation. ECOT has not demonstrated that ODE's requests are not supported by the statutory language.

### III. Conclusion

{¶ 29} We determine that R.C. 3314.08 is unambiguous and authorizes ODE to require an e-school to provide data of the duration of a student's participation to substantiate that school's funding. Accordingly, we affirm the judgment of the Tenth District Court of Appeals.

Judgment affirmed.

O'CONNOR, C.J., and GWIN and DEGENARO, JJ., concur.

O'DONNELL, J., dissents, with an opinion.

KENNEDY, J., dissents, with an opinion.

DEWINE, J., not participating.

W. SCOTT GWIN, J., of the Fifth District Court of Appeals, sitting for FRENCH, J.

_____

**O'DONNELL, J., dissenting.**

{¶ 30} Respectfully, I dissent.

{¶ 31} R.C. 3314.08 does not authorize the Ohio Department of Education ("ODE") to base funding of an Internet-based community school on the duration of student participation in learning opportunities; rather, it requires that funding be based on student enrollment.

{¶ 32} The Electronic Classroom of Tomorrow ("ECOT") is an e-school that began operations in 2000 and has been funded by ODE pursuant to a funding agreement which took effect in 2002 and set forth the documentation that ECOT needed to provide to ODE to secure funding. That agreement did not include

durational data, and ECOT received funding from ODE following ODE audits in 2002, 2003, 2005, 2006, and 2011 based exclusively on student enrollment.

{¶ 33} In 2016, *without any statutory or administrative rule changes*, ODE for the first time announced its intent to base ECOT funding on the duration of student participation in learning opportunities and requested that ECOT provide durational records in order to obtain funding. As a result, ECOT filed this action seeking specific performance of its funding agreement and an injunction to preclude ODE from violating R.C. 3314.08(H)(3) and using durational data during its full-time-equivalency ("FTE") review. Following a hearing, the trial court denied relief, concluding that R.C. 3314.08(H)(3) conditions ECOT funding on student participation. It also determined that the funding agreement applied only to the ODE 2002 and 2003 FTE reviews and therefore, ODE could consider durational data in its 2015-2016 FTE review of ECOT. The court of appeals affirmed the judgment of the trial court and permitted ODE to require durational data from ECOT as a basis for its funding, agreeing with the trial court that R.C. 3314.08(H)(3) authorizes ODE to consider durational data and that the funding agreement applied only to the 2002-2003 funding year.

{¶ 34} The proposition of law in this case, however, does not pertain to whether ECOT funding arises from its agreement with ODE. Here, we are concerned with whether R.C. 3314.08(H)(3) authorizes durational funding because the proposition of law before this court states: "ODE is barred, by the plain and unambiguous language of R.C. § 3314.08, from imposing the challenged durational criterion." Plainly, the statute does not authorize the use of durational data as a basis for funding ECOT. Rather, the statute unambiguously uses the percentage of learning opportunities offered to a student as the basis for funding.

### Law and Analysis

{¶ 35} R.C. 3314.01(B) states a community school "is a public school, independent of any school district, and is part of the state's program of education."

R.C. 3314.015(G) prohibits ODE from imposing requirements on community schools "that are not permitted by law or duly adopted rules" in carrying out its duties pursuant to R.C. Chapter 3314.

{¶ 36} Importantly, for purposes of the proposition of law presented in this case, R.C. 3314.08(C)(1) mandates that ODE provide funding for community schools "on a full-time equivalency basis, for each student *enrolled*." (Emphasis added.) Further, R.C. 3314.08(H) directs that ODE "shall adjust the amounts subtracted and paid under division (C) of this section to reflect any *enrollment* of students in community schools for less than the equivalent of a full school year." (Emphasis added.)

{¶ 37} R.C. 3314.08(H)(3) provides the means by which FTE is to be calculated:

> The department shall determine each community school student's percentage of full-time equivalency based on *the percentage of learning opportunities offered by the community school to that student*, reported either as number of hours or number of days, is [sic] of *the total learning opportunities offered by the community school to a student who attends for the school's entire school year*. However, no internet- or computer-based community school shall be credited for any time a student spends participating in learning opportunities beyond ten hours within any period of twenty-four consecutive hours. Whether it reports hours or days of learning opportunities, each community school shall offer not less than nine hundred twenty hours of learning opportunities during the school year.

(Emphasis added.)

**{¶ 38}** The majority concludes that R.C. 3314.08 unambiguously authorizes ODE to fund an e-school based on the duration of student participation. Majority opinion at ¶ 29. In its opinion, the majority reasons:

> By stating that the maximum daily credit for each student is ten hours, it is apparent that the legislature intended that an e-school will be credited for a student's participation for less than ten hours in a day. This calculation can be made only by referring to records that contain evidence of the duration of a student's participation in learning opportunities.

*Id.* at ¶ 14.

**{¶ 39}** The majority fails to give effect to the plain language of R.C. 3314.08(H)(3), which provides that ODE must calculate a student's percentage of FTE based on the percentage of learning opportunities *offered* to that student— which is dependent on the length of that student's enrollment—of the total learning opportunities offered to students who attend for the entire school year. If the legislature had intended to condition funding on the duration of a student's participation in the learning opportunities offered by a community school, it could have expressed that intent by using a phrase such as "based on the percentage of learning opportunities *participated in by* that student," but it did not do so. Rather, it stated that funding is "based on the percentage of learning opportunities offered by the community school to that student." R.C. 3314.08(H)(3).

**{¶ 40}** The majority confuses the reference to a ten hour maximum daily credit in R.C. 3314.08(H)(3) with funding based on the duration of student participation. E-schools, unlike traditional brick and mortar schools, are able to offer learning opportunities to students 24 hours a day, seven days a week. Therefore, an e-school could theoretically offer an entire school year consisting of

14

920 hours of learning opportunities to a student who enrolled for only 39 calendar days. To prevent such a result, the General Assembly has precluded an e-school that reports its learning opportunities offered as a number of hours from obtaining credit for offering more than 10 hours of learning opportunities in a period of 24 consecutive hours, even if a particular student actually participates in more than 10 hours of learning opportunities during such period. *See* R.C. 3314.08(H)(3). Notably, however, nothing in the ten hour rule expresses a legislative intent to authorize ODE to condition funding for e-schools based on the duration of student participation in learning opportunities. Although no such language is in the statute, the majority finds such a funding condition in that ten hour rule and thereby erroneously allows ODE to impose a requirement on a community school that is not based on the plain language of the statute.

{¶ 41} The majority's reliance on R.C. 3314.27, which also has a ten hour rule, is misplaced because that statute contains *no funding provisions whatsoever*. Rather, it merely prohibits students enrolled in e-schools from participating in more than 10 hours of learning opportunities in any 24 hour period, states that participation beyond this limit "shall not count toward the annual minimum number of hours required to be provided to that student as prescribed in division (A)(11)(a) of section R.C. 3314.03 of the Revised Code" (which governs contracts between the governing authority of a community school and its sponsor), and requires that e-schools track individual student participation in learning opportunities and keep that record "in such a manner that the information contained within it easily can be submitted to" ODE.

{¶ 42} The majority's conclusion that R.C. 3314.08 permits ODE to require an e-school to provide data regarding the duration of a student's participation in order to calculate its funding is contrary to the statute because the statute plainly bases funding on the learning opportunities offered to students during their enrollment and does not refer to the duration of student participation. It is a

commonly accepted precept of statutory construction that courts cannot add words to a statute when construing it to determine legislative intent. *In re Adoption of P.L.H.*, 151 Ohio St.3d 554, 2017-Ohio-5824, 91 N.E.3d 698, ¶ 27; *State ex rel. Russo v. McDonnell*, 110 Ohio St.3d 144, 2006-Ohio-3459, 852 N.E.2d 145, ¶ 50.

{¶ 43} To condition funding based on participation instead of enrollment contradicts the plain language of the statute and thwarts legislative intent. Moreover, such a condition places a burden on community schools different from that placed on traditional brick and mortar schools, for which the General Assembly has designated three separate days in order to calculate student enrollment and then bases school funding on the number of students enrolled on those three days without regard to student attendance for the rest of the year. *See* R.C. 3317.01, 3317.03, and 3317.036.

{¶ 44} Today's decision demands that the General Assembly clarify its intent with regard to the question of funding for online community schools. More than 10,000 students across our state have been affected by today's singular decision, and thousands more could be affected by the precedent set in this decision. If in fact it is the intent of the General Assembly to fund online community schools based on learning opportunities as R.C. 3314.08 specifies, the General Assembly needs to clarify that intent to eliminate confusion arising from today's decision and the ODE's insistence on using durational data to fund online community schools.

{¶ 45} I would reverse the judgment of the court of appeals and remand the matter to the trial court for further proceedings.

_____

**KENNEDY, J., dissenting.**

{¶ 46} Until today, the bedrock principle of school funding was that state education money "follows the student." *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 53. The majority, however, establishes an exception to that funding

mechanism: state education dollars follow the student when he or she enrolls in an Internet- or computer-based community school ("e-school"), but only for those periods during the day when the student chooses to log on to the school's network and to participate online in the education opportunities offered to the student.

{¶ 47} Prior to the 2015-2016 school year, appellant, the Electronic Classroom of Tomorrow ("ECOT"), received state education funding based on its enrollment adjusted for each student's full-time equivalency ("FTE"), the percentage of the school year that the student was enrolled. ECOT verified the FTE that it reported to appellee, the Ohio Department of Education ("ODE"), by having teachers certify the total number of learning opportunities offered to each student. However, beginning in January 2016, ODE requested that ECOT submit data to demonstrate the duration and frequency of students' participation (i.e., log-on and log-off times) in ECOT's online educational programs. The majority today agrees with ODE that it may "require an e-school to provide data of the duration of a student's participation to substantiate that school's funding," majority opinion at ¶ 29, reasoning that "student participation is the relevant measure for calculating the public funding of e-schools," *id*. at ¶ 16.

{¶ 48} Because this holding disregards the plain meaning of R.C. 3314.08(H)(3), ignores the reality of how students attend and learn in e-schools, and eviscerates the intent of the General Assembly to provide a choice of school environments "to provide a chance of educational success for students who may be better served in their educational needs in alternative settings," *Ohio Congress of Parents & Teachers* at ¶ 32, I dissent.

{¶ 49} The narrow question presented in this case is whether ODE has authority to adjust state funding for an e-school, in this case ECOT, based on the amount of time its students participate online in learning opportunities while enrolled in the school. Rules of statutory construction require that statutes be read as an interrelated body of law and construed in context. *Riffle v. Physicians &*

*Surgeons Ambulance Serv., Inc.*, 135 Ohio St.3d 357, 2013-Ohio-989, 986 N.E.2d 983, ¶ 21. The analysis in this case should begin with examining the entire statutory scheme in which the state of Ohio provides funding for all public schools—traditional public schools, community schools, and e-schools, a type of community school.

**State Funding of Public Schools**

*Traditional Public Schools*

{¶ 50} The state guarantees a minimum level of funding for each student enrolled in a public school, *Ohio Congress of Parents & Teachers*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 53. That funding is called the "formula amount." R.C. 3317.02(F). Traditional public schools are funded with a combination of state and local tax dollars, and the amount of state funding generally is determined by multiplying the formula amount by "the enrollment of students receiving services from schools," R.C. 3317.03(A), in the district as adjusted by ODE, R.C. 3317.017 and 3317.02(E), and then adjusting that amount further based on the relative wealth of the school district as compared to other school districts within the state, R.C. 3317.022. Although public-school-funding formulas are complex, "we may summarize them by saying that state money follows the student." *Ohio Congress of Parents & Teachers* at ¶ 53. Therefore, "[s]tate funding of school districts depends on enrollment," *id.* at ¶ 36, fn. 8, and the state reduces funding when a student moves out of the district, attends a private school, or is schooled at home, *id.* at ¶ 36.

{¶ 51} The number of students enrolled in and receiving services from a school district is counted three times a year—in October, March, and June—and reported to ODE to determine funding levels. R.C. 3317.03(A) and (D)(1). R.C. 3317.03(A)(2) directs ODE to compile a list of all students reported to be enrolled in a district and a list of all students entitled to attend school in the district on an FTE basis but who receive educational services from other entities, including

community schools. In addition, R.C. 3317.03(E) directs every school in a district to maintain attendance records to show the actual enrollment in each school in a manner that no student is counted as enrolled before the student attends the school or after the student permanently withdraws.

{¶ 52} For traditional public schools, R.C. 3317.034(B) provides that a student is considered enrolled in the school district "on the date on which the school has both received the documentation of the student's enrollment from a parent and the student has commenced participation in learning opportunities offered by the district." R.C. 3317.034(C) provides that enrollment ceases on the date (1) the school district "receives documentation from a parent terminating enrollment of the student," (2) the school district "is provided documentation of a student's enrollment in another public or nonpublic school," or (3) "[t]he student ceases to participate in learning opportunities provided by the school."

*Community Schools*

{¶ 53} In 1997, the General Assembly enacted charter-school legislation, declaring that its purposes included " 'providing parents a choice of academic environments for their children and providing the education community with the opportunity to establish limited experimental educational programs in a deregulated setting.' " *Ohio Congress of Parents & Teachers*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 5-6, quoting Am.Sub.H.B. No. 215, Section 50.52, Subsection 2(B), 147 Ohio Laws, Part I, 877, 2043. A community school is a public school that is independent of a local school district, *id.* at ¶ 7; it is funded directly by the state, *id.* at ¶ 37. The intent of the General Assembly in allowing community schools was to "provide a chance of educational success for students who may be better served in their educational needs in alternative settings." *Id.* at ¶ 32. A community school may "target and tailor programs for small student populations such as learning-disabled students or dropouts from traditional schools." *Id.* at ¶ 6.

**{¶ 54}** A community school is formed as a nonprofit corporation or a public-benefit corporation and is privately run pursuant to a contract with the school's sponsor. *Id*. at ¶ 7. R.C. 3314.03(A) specifies terms that must be included in the contract, including that "[t]he school will provide learning opportunities to a minimum of twenty-five students for a minimum of nine hundred twenty hours per school year." R.C. 3314.03(A)(11)(a). The statute does not specify what "learning opportunities" are but rather says that they are to "be defined in the contract"; they must be "in compliance with criteria and documentation requirements for student participation" established by ODE. R.C. 3314.08(H)(2). Further, it is the sponsor, not ODE, that is responsible for monitoring the school's performance and compliance with state standards and requirements, and in turn, a sponsor's contract is overseen by ODE. *Ohio Congress of Parents & Teachers* at ¶ 7. Because community schools are meant to be laboratories for experimental educational programs to reach students that traditional public schools have not, they are exempt from many of the state laws and regulations applicable to traditional public schools, R.C. 3314.04. And although a community school "must comply with many of the same statewide academic standards" as a traditional public school, *Ohio Congress of Parents & Teachers* at ¶ 7, ODE has no control over how a community school's curriculum will be delivered. *See* R.C. 3301.079(B).

**{¶ 55}** Like funding of a traditional public school, the amount of state funding provided to a community school is calculated based on enrollment. R.C. 3314.08(C)(1); *Ohio Congress of Parents & Teachers* at ¶ 52 ("Community schools are primarily funded by a per capita subsidy taken from the state's basic aid to the school districts that the students in community schools are entitled to attend"). Enrollment in a community school is reported to ODE by both the school district and the community school. R.C. 3317.03(B)(3)(d); R.C. 3314.08(B)(2). For each student who enrolls in a community school, the state deducts the state aid that would have been paid to the student's school district from that district's funding and pays

those funds to the community school. R.C. 3314.08(C)(1). That is, the state "reduces its per-pupil funding to the school district, just as it does when students leave for private schools, for other school districts, or for home schooling." *Ohio Congress of Parents & Teachers* at ¶ 37.

**{¶ 56}** And as with a traditional public school, a community school receives funding only for that part of the school year that the student is enrolled. R.C. 3314.08(H) directs ODE to adjust the amounts subtracted from the student's school district and paid to the community school "to reflect any enrollment of students in community schools for less than the equivalent of a full school year." FTE is a "percentage of learning opportunities offered by the community school to that student * * * of the total learning opportunities offered by the community school to a student who attends for the school's entire school year." R.C. 3314.08(H)(3). The statute provides that learning opportunities may be expressed as a number of hours or days, and FTE may be calculated using a simple fraction:

$$\frac{\text{learning opportunities offered to a particular student}}{\text{learning opportunites offered to a student who attends for the entire school year}}.$$

**{¶ 57}** For example, suppose a community school offers students who attend the entire school year 920 hours of learning opportunities spread out over 184 days, so that the school offers five hours of learning opportunities a school day. If a student enrolls on the 93rd day of classes and continues until the end of the school year, the school would offer 460 hours of learning opportunities to that student (92 days times 5 hours a day). Calculating the FTE for that student would require dividing 460 by 920, which equals 0.5 or 50 percent. To determine the minimum state aid for that student, ODE would then multiply that percentage by the formula amount, which was $5,800 for fiscal year 2015, former R.C. 3317.02(G), 2014 Am.Sub.H.B. No. 483. The minimum funding for the student to be paid to the community school would be $2,900. And if that student had been previously enrolled in a traditional public school, the traditional school would retain

the other half of the formula amount. The same calculation can be made if the student enrolled, attended 23 days of class, and then withdrew: $\frac{23 \text{ days x 5 hours per day}}{920}$ equals 0.125 (or 12.5 percent), and 12.5 percent of $5,800 equals $725 in minimum funding paid to the community school for that student. And if the student enrolled in a traditional public school for the remainder of that school year, the traditional school would retain $5,075.

{¶ 58} As these calculations show, R.C. 3314.08(H)(3) simply recognizes that as in a traditional public school, students do not always enroll in and attend a community school for the entire year—they might spend part of the year enrolled in a traditional public school, a private school, or another community school, or they might be home schooled. R.C. 3314.08(H)(3) therefore ensures that a community school receives funding for a student only during the time the student is actually enrolled in the community school, just as a traditional public school receives state education dollars for only that part of the year that a student is enrolled in and receiving services from the school district. R.C. 3317.03(A).

{¶ 59} Like it has for traditional public schools, the General Assembly has indicated when a student is enrolled in a community school. R.C. 3314.08(H) provides that a student is considered enrolled in a community school

> for the period of time beginning on the later of the date on which the [community] school both has received documentation of the student's enrollment from a parent and the student has commenced participation in learning opportunities as defined in the contract with the sponsor, or thirty days prior to the date on which the student is entered into the education management information system.

Enrollment in a community school continues until the date (1) "[t]he community school receives documentation from a parent terminating enrollment of the student," (2) the community school "is provided documentation of a student's enrollment in another public or private school," or (3) "[t]he community school ceases to offer learning opportunities to the student pursuant to the terms of the contract with the sponsor or the operation of any provision of this chapter." R.C. 3314.08(H)(2)(a) through (c).

{¶ 60} Like a traditional public school, in which a student's enrollment is considered to cease when "[t]he student ceases to participate in learning opportunities provided by the school," R.C. 3317.034(C)(3), a student's enrollment in a community school is affected when a student ceases to participate in learning opportunities for an extended period of time. R.C. 3314.03(A)(6)(b) states that the contract establishing a community school requires the school to "adopt an attendance policy that includes a procedure for automatically withdrawing a student from the school if the student without a legitimate excuse fails to participate in one hundred five consecutive hours of the learning opportunities offered to the student."

*E-Schools*

{¶ 61} In 2002, the General Assembly expanded a parent's choice of community school academic environments to include e-schools. R.C. 3314.02(A)(7), Sub.H.B. No. 364, 149 Ohio Laws, Part V, 10175, 10209. E-schools are a type of community school, *id.*, and most of the statutes discussed above that apply to community schools in general also apply to e-schools.

{¶ 62} Like state funding for traditional public schools and brick-and-mortar community schools, state funding for e-schools depends on enrollment. R.C. 3314.08(C)(2) provides for "deducting from the state education aid of a student's resident district *for students enrolled* in an internet- or computer-based community school and making payments to such school." (Emphasis added.) As with traditional public schools and brick-and-mortar community schools, because

funding is tied to enrollment, the statutes establish detailed requirements for when enrollment in an e-school begins and ends.

{¶ 63} Enrollment begins (1) when the e-school has received documentation of the student's enrollment from a parent and the student has commenced participation in learning opportunities or (2) 30 days prior to the date on which the student is entered into an education-management-information system, whichever is later. R.C. 3314.08(H)(2). Enrollment continues until the e-school receives documentation from a parent terminating enrollment, it receives documentation that the student enrolled in another school, or it ceases to offer learning opportunities to the student. R.C. 3314.08(H)(2)(a) through (c).

{¶ 64} Moreover, funding for an e-school continues "without interruption at the start of the subsequent school year" for any student who completed the prior school year at the e-school unless the student "without a legitimate excuse fails to participate in the first one hundred five consecutive hours of learning opportunities offered to the student in that subsequent school year." R.C. 3314.08(H)(2). If the student fails to participate, then he or she is not considered to have "re-enrolled in the school for that school year and the [ODE] shall *recalculate* the payments to the school for that school year to account for the fact that the student is not enrolled." (Emphasis added.) *Id*.

{¶ 65} R.C. 3314.03(A)(6)(b) requires an e-school to include in its contract an attendance policy with a procedure for automatically withdrawing a student from the school if the student, without a legitimate excuse, "fails to *participate* in one hundred five consecutive hours of the learning opportunities offered to the student." (Emphasis added.) Therefore, the General Assembly has decided that a student's enrollment in an e-school can be affected when a student ceases to participate in learning opportunities for an extended period of time. R.C. 3314.08(H)(2)(c) requires ODE to recalculate payments when the student does not participate in 105 consecutive hours of learning opportunities, but no statute allows ODE to

recalculate payments when a student fails to participate online for less than 105 consecutive hours. The distinction is significant, because it shows that enrollment triggers funding. An e-school receives funding for an enrolled student who fails to participate for 105 hours up until the time that that student is automatically unenrolled, but it does not receive funding for the student who fails to participate for 105 hours at the beginning of the next school year, because that student is deemed to never have enrolled. It is the lack of enrollment, not the lack of participation, that terminates the funding for the student.

**{¶ 66}** As with a traditional public school or a brick-and-mortar community school, the General Assembly has contemplated that students may attend an e-school for less than the whole school year. R.C. 3314.08(H) directs ODE to adjust the amounts subtracted from school districts and paid to e-schools "to reflect any enrollment of students in community schools for less than the equivalent of a full school year." The same formula used to calculate FTE for community schools is used for e-schools:

$$\frac{\text{learning opportunities offered to a particular student}}{\text{learning opportunites offered to a student who attends for the entire school year}}.$$ R.C. 3314.08(H)(3).

## ECOT

### *ECOT's FTE Calculation*

**{¶ 67}** It is not disputed that for most of ECOT's existence, it was funded based on the enrollment it reported, not the number of hours in which students participated in learning opportunities.

**{¶ 68}** In January 2003, ECOT and ODE entered a funding agreement that set forth "the documentation of student enrollment, learning opportunities, and funding standards." That agreement provided that "State funding for students enrolled in the School is due and shall continue to be paid to the School until the

student graduates, withdraws * * *, or is no longer eligible to attend the school * * *."  It also memorialized the understanding that

> [s]tate law currently requires that each student must be presented with at least 920 hours of learning opportunities per academic year. These learning opportunities may come from an array of different educational opportunities, such as direct (including computerized) instruction, participation in curriculum related activities, assignments and events, readings, field trips, tutoring, etc.

{¶ 69} The parties agreed that ECOT would maintain documentation of "learning opportunity hours" as verified by an appropriate certificated ECOT employee and that "ODE shall fund the School for all students enrolled as set forth in [the funding agreement], pursuant to the Ohio Revised Code section 3314.08," subject to a review of each student's FTE.

{¶ 70} ODE verified that ECOT's funding was consistent with its reported enrollment pursuant to the funding agreement in reviews conducted for fiscal years 2003, 2005, 2006, and 2011.  The state auditor also audited ECOT's FTE calculations yearly.  Marnie Carlisle, an assistant chief deputy auditor, stated in an affidavit that the office relied on ODE's guidance that "the key was the learning opportunities offered by eschools, as opposed to student engagement, duration, or online hours."  She also testified:

> What we were consistently informed is that community schools, including e-schools, are funded based upon annualized enrollment as opposed to attendance, those two concepts are different, and that the focus of our testing should be upon enrollment and certainly attendance impact of the 105-hour rule for withdrawal from

enrollment, and so we should look at documentation supporting enrollment of students, withdrawal of students, as well as whether or not students are complying with the 105-hour rule and are being withdrawn timely by the schools.

She agreed that ODE had told her that the teachers' certification of the hours of learning opportunities offered to students was "a sufficient form of documentation to confirm that 920 hours of learning opportunities had been offered by the school to a student." None of the audits revealed any material issues.

{¶ 71} Further, John Francis Wilhelm, the ODE employee who conducted the 2011 review, testified that he would not have requested, and ECOT was not required to provide, "documentation that would have measured the length or time of a student's engagement in any particular learning opportunity" nor would he "have otherwise examined the length of time that a student was on a computer any particular day." He also explained that in reviewing other e-schools prior to 2016, he did not seek records documenting participation in learning opportunities. ODE continued funding ECOT based on the school's reports of enrollment and hours of learning opportunities offered to each student as certified by teachers.

{¶ 72} Only in 2016, *in the middle of the school year*, did ODE disregard this established course of dealing and assert, for the first time, that state funding depends on the duration of participation, not enrollment. However, there had been no change in the funding statute or in ODE's administrative rules, and ODE's reviewer, Wilhelm, testified that he did not think it likely that the e-schools he reviewed would have had any records documenting the duration of participation. The auditor's office likewise viewed the requirement to document the duration of participation as a changed approach and sought further guidance from ODE in conducting its audits.

**{¶ 73}** ODE justified the new requirements by pointing out that beginning in 2010, its FTE review manuals directed its reviewers to scrutinize individual attendance records to determine "when a student has logged on and off while accessing learning opportunities." Although R.C. 3314.08(H)(2) permits ODE to establish "criteria and documentation requirements for student participation," neither the 2010 manual nor any subsequently issued review manuals had the force of law, because they were not promulgated in an administrative rule pursuant to R.C. Chapter 119. An agency cannot enforce a new legal rule against the public until it is formally promulgated as a rule pursuant to R.C. Chapter 119. *Fairfield Cty. Bd. of Commrs. v. Nally*, 143 Ohio St.3d 93, 2015-Ohio-991, 34 N.E.3d 873, ¶ 29. Further, R.C. 3314.015(G) provides that "[i]n carrying out its duties under [R.C. Chapter 3314], the department shall not impose requirements on community schools or their sponsors that are not permitted by law or duly adopted rules."

**{¶ 74}** In any case, because the General Assembly has provided that an e-school's funding depends on its enrollment, ODE may not—through a manual or an administrative rule—reduce ECOT's funding because of a lack of documentation that its enrolled students participated in learning opportunities. *See Williams v. Spitzer Autoworld Canton, L.L.C.*, 122 Ohio St.3d 546, 2009-Ohio-3554, 913 N.E.2d 410, ¶ 18 ("A rule that is in conflict with law is invalid and unconstitutional * * *").

**{¶ 75}** Accordingly, ECOT complied with the funding agreement, the historical practice, and R.C. 3314.08 when it calculated the FTE of its students for the 2015-2016 school year at issue here. In a September 7, 2016 letter reporting the findings of the FTE review for 2015-2016, ODE's reviewer, Wilhelm, examined a random sample of student files and noted that "[e]ach file reviewed contained student engagement logins that were *accurate* for beginning and ending days for *enrollment purposes*." (Emphasis added.) His final review disclosed that each student's file documented only when the student logged on each day and did

not show when the student logged off and that "[t]here was no hourly/daily/weekly accounting of hours in which the student accessed learning opportunities." And although each file had a teacher's certification of the number of hours of learning opportunities ECOT offered to the student, Wilhelm concluded that under ODE's current policy, ECOT's attendance records could not substantiate its FTE reports without data documenting the time students spent online. He therefore recommended another FTE review "to check for both log-ins and log-outs of randomly selected students as well as verify a running record of hours and minutes of individual student participation of both computer and non-computer learning that correlates with the stated fte."

{¶ 76} Nonetheless, Wilhelm testified that but for the lack of records documenting the duration of each student's participation, ECOT had provided sufficient documentation to support its FTE calculations and would have passed the review based on the criteria used in prior years.

*The Ten-Hour Cap in R.C. 3314.08(H)(3)*

{¶ 77} ODE challenged ECOT's calculation of FTE by relying on language in R.C. 3314.08(H)(3) and 3314.27 that applies only to e-schools and that had existed at the time of the prior review of ECOT's funding in 2011. The language in R.C. 3314.08(H)(3) was originally added to the statute in 2005 in subdivision (L)(3) and states that "no internet- or computer-based community school shall be credited for any time a student spends participating in learning opportunities beyond ten hours within any period of twenty-four consecutive hours." Former R.C. 3314.08(L)(3), Am.Sub.H.B. No. 66, 151 Ohio Laws, Part II, 2868, 3458. In the same act, R.C. 3314.27 was enacted:

No student enrolled in an internet- or computer-based community school may participate in more than ten hours of learning opportunities in any period of twenty-four consecutive

hours. Any time such a student participates in learning opportunities beyond the limit prescribed in this section shall not count toward the annual minimum number of hours required to be provided to that student as prescribed in division (A)(11)(a) of section 3314.03 of the Revised Code.

151 Ohio Laws, Part II, at 3466.

{¶ 78} R.C. 3314.27 refers to R.C. 3314.03(A)(11)(a), which provides that the contract between the sponsor and the governing authority must require the community school to provide learning opportunities to a minimum of 25 students for a minimum of 920 hours per school year. Accordingly, pursuant to R.C. 3314.08(H)(3) and 3314.27, any hours that exceed 10 hours in a 24-hour period do not count toward the 920 hours of learning opportunities that an e-school is required to offer to its students.

{¶ 79} ODE relies on these statutes to support its view that an e-school's funding depends on "the duration of a student's participation" as documented by durational participation data, including when each student logged in and out of the e-school's online educational platform. And even though ODE had previously allowed ECOT to verify the FTE it reported by having its teachers certify the number of learning opportunities offered to each student, ODE maintains that those certifications are not sufficient and contends that e-schools are paid for a student's participation, not for the learning opportunities offered to an enrolled student.

{¶ 80} R.C. 3314.08(H)(3) and 3314.27 do not, however, make e-school funding turn on the amount of time a student actually participates online in learning opportunities. Rather, it is the opposite: the point of these statutes is to *prevent* a student's online participation from being the measure of FTE. The General Assembly recognized that unlike students in brick-and-mortar schools, which have doors and close at the end of day, students enrolled in an e-school have no physical

barrier preventing them from participating in the learning opportunities offered by their school at any hour and completing a year's worth of work in a shorter time. Without R.C. 3314.08(H)(3) and 3314.27, an e-school could seek funding for the equivalent of a full school year based on the student's participation in and completion of 920 hours in a much shorter time period, even if the student had attended a traditional public school for part of the year. Those hours exceeding the ten-hour cap are therefore not included when calculating the "percentage of learning opportunities offered by the community school to that student * * * of the total learning opportunities offered by the community school to a student who attends for the school's entire school year," R.C. 3314.08(H)(3), and therefore are not included in calculating the e-school's funding.

{¶ 81} Accordingly, R.C. 3314.08(H)(3) does not change the fact that in funding all public schools—traditional public schools, brick-and-mortar community schools, and e-schools—enrollment drives the calculation. Just as when a student enrolls in a traditional public school or a brick-and-mortar community school, state money follows the student when he or she enrolls in an e-school, and funding continues until the student is no longer enrolled. R.C. 3314.08(C) and 3317.03(A) and (D)(1); *see generally Ohio Congress of Parents & Teachers*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 37, 39.

{¶ 82} The majority reads much more into R.C. 3314.08(H)(3). It reasons that

> [b]y stating that the maximum daily credit for each student is ten hours, it is apparent that the legislature intended that an e-school will be credited for a student's participation for less than ten hours in a day. This calculation can be made only by referring to records that contain evidence of the duration of a student's participation in learning opportunities.

Majority opinion at ¶ 14. And from the premise that an e-school is required to keep track of students' online participation for purposes of the ten-hour cap, it leaps to the conclusion that "[i]n order to calculate funding, ODE is authorized to consider evidence of the duration of a student's participation." *Id*. at ¶ 20.

{¶ 83} This logic is dubious at best. It is true that an e-school will not receive *credit* for any time that a student participates in learning activities for more than ten hours a day, but that does not mean that an e-school will be *funded* only for the amount of time that the student chooses to participate in the e-school's online educational platform. R.C. 3314.08(C)(2) ties state education aid to enrollment, and no statute expressly links funding to *participation* in learning opportunities or logging in to lessons online; tellingly, R.C. 3314.08(H)(3) does not use the words "duration," "online," or "log in." And had the General Assembly intended the ten-hour cap to modify the amount of funding paid to an e-school, it would have said so in R.C. 3314.08(C)(2) when it provided for payments to e-schools. It did not.

{¶ 84} The majority therefore interprets R.C. 3314.08(H)(3) more broadly than the General Assembly intended, taking a limited provision for calculating FTE that simply caps the number of hours of learning opportunities available to a student on a given day and inferring from it a new restriction on e-school funding that is not based on enrollment as provided by R.C. 3314.08(C)(2) but rather is determined by durational data documenting online participation.

{¶ 85} ODE's argument and the majority's conclusion that an e-school's funding depends on the student's online participation in learning opportunities cannot be squared with the plain language of R.C. 3314.08(H)(3). That statute provides that after funding has been triggered by the student's enrollment pursuant to R.C. 3314.08(C)(2), it will be adjusted based upon the student's FTE, which is determined as a "percentage of learning opportunities *offered* by the community

school to that student * * * of the total learning opportunities *offered* by the community school to a student who attends for the entire school year." (Emphasis added.) The word "offered" is not defined in the statute, and we therefore must construe it according to its common usage, R.C. 1.42. "Offer" means "to present for acceptance or rejection: hold out" and "to make available or accessible: SUPPLY: AFFORD." (Capitalization sic.) *Webster's Third New International Dictionary* 1566 (3d Ed.2002). The word "participate" means "to take part in something (as an enterprise or activity) usu. in common with others." *Id.* at 1646. Nothing in the meaning of the word "offer" suggests that it is synonymous with "participate," and there is a difference between a school making a learning opportunity available to a student and the student's choice to take that opportunity and participate in learning.

{¶ 86} Throughout the statutory scheme for funding public schools, the legislature has used the terms "enrolled," "enrollment," "offered," "participated," and "participation." Contrary to the majority's analysis today, courts generally presume that when the General Assembly uses different words in a statute, it intends those words to have different meanings. *See Kiefer v. State*, 106 Ohio St. 285, 290, 139 N.E. 852 (1922); *Huntington Natl. Bank v. 199 S. Fifth St. Co.*, 10th Dist. Franklin No. 10AP-1082, 2011-Ohio-3707, ¶ 18; *State v. Steele*, 8th Dist. Cuyahoga No. 105085, 2017-Ohio-7605, ¶ 15. Therefore, as a matter of statutory construction, even if R.C. 3314.08(H)(3) were somehow ambiguous, "offered" cannot be equated with "participated."

{¶ 87} Further, ODE's argument and the majority's construction of the statute ignores how an e-school like ECOT operates. The legislature provided that " 'learning opportunities' shall be defined in the contract" between the community school and its sponsor. R.C. 3314.08(H)(2). The General Assembly has therefore left it to the school and its sponsor to determine how learning opportunities will be offered to students, and ODE therefore lacks authority to dictate that all learning in

an e-school must be completed online. And here, ECOT's contract with its sponsor indicates that lessons are "*provided* online for daily access to the rigorous and relevant content, to be completed at the child's pace at home." (Emphasis added.) Learning opportunities did not have to be completed online, and ECOT recognized that they "include but are not limited to direct instruction, opportunity to participate in class work/activities either electronically or through other means, readings, field trips, participation in curriculum related activities and events, tutoring, etc." And ECOT permitted teachers to use various "instructional delivery methods," including nonelectronic course materials such as "workbooks, instructional grade-level packets, field trips, Educational CDs, textbooks, manipulative materials and literary materials."

**{¶ 88}** Although some class content was streamed over the Internet, assignments were not completed solely by working online for the whole school day. Rather, ECOT's Parent/Student Handbook instructed students to open their assignments in Microsoft Word and save the assignments *offline* on their computer hard drives. Students could then complete their assignments without being logged onto ECOT's educational platform and then log on again to submit their finished work by attaching it to a message to their teacher. Some online resources were available to students on websites not on ECOT's educational platform or were on applications for tablets that were not a part of ECOT's system. Moreover, ECOT provided each student with a printer and a scanner, which students could use to print assignments, complete them by hand, and then scan and upload them for grading. The majority therefore incorrectly assumes that students had to remain logged onto ECOT's educational platform in order to participate in the learning opportunities the school offered them.

**{¶ 89}** For this reason, the amount of time a student spent logged on is irrelevant to determining the duration of a student's participation in learning opportunities. Rather, like any other school, ECOT relied on its teachers to verify

that students were participating and completing their assignments. ECOT required teachers to conduct proctoring sessions with every student "voice to voice through a classroom live (WebEx) session, over the phone, and/or in a face-to-face meeting." Teachers were also to review, comment on, and grade assignments just as teachers in traditional public schools and brick-and-mortar schools do. And just like parents of students enrolled in other schools, parents had the ultimate responsibility to ensure that a child completed an assignment. For this reason, ECOT encouraged face-to-face meetings between teachers, parents, and students at "family nights" and parent-teacher conferences.

{¶ 90} The Parent/Student Handbook also recognized that "non-electronic learning opportunities" can supplement and enhance a student's education, providing learning in a different environment and bringing community resources—"natural, artistic, industrial, commercial, governmental, and educational"—to the student. ECOT permitted students to earn credit for "field experience, internship, and/or mentorship" through a course of independent-study classes as well as through music, art, sports, community service, and tutoring. Students could even earn high-school credit for courses taught on college campuses, as long as they provided their own transportation. Then, at the end of the school year, ECOT's teachers certified the total hours of educational opportunities offered to each student they taught.

{¶ 91} The state establishes the educational standards that students are meant to achieve, but in light of "the experimental spirit behind R.C. Chapter 3314," *Ohio Congress of Parents & Teachers*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 32, it cannot tell e-schools how best to deliver a curriculum to students, *see* R.C. 3301.079(B). And the General Assembly has afforded e-schools flexibility in shaping the learning opportunities offered. Schools like ECOT might be a student's last resort in Ohio. According to an ECOT official, students enrolled in ECOT have high rates of mobility, poverty, and special needs

and are typically two grades behind their peers. Given these facts, it is not surprising that, as with traditional public schools and brick-and-mortar community schools, the statute ties state education funding to enrollment and learning opportunities offered by the e-school rather than to other metrics such as student participation or academic success. If student participation or academic success were the metric for funding, one could envision that a large number of traditional public schools would miss out on state education dollars as well.

{¶ 92} Nonetheless, the majority asserts that even though the General Assembly used the word "offered" in R.C. 3314.08(H), that "is only one word of the operable language of the statute, which when read in full, does not indicate that the legislature intended for e-schools to be funded merely for *offering* learning opportunities." (Emphasis sic.) Majority opinion at ¶ 22. That attempt to read the word "offer" out of the statute fails, because " '[t]he preeminent canon of statutory interpretation requires us to "presume that [the] legislature says in a statute what it means and means in a statute what it says there." ' " *State ex rel. Lee v. Karnes*, 103 Ohio St.3d 559, 2004-Ohio-5718, 817 N.E.2d 76, ¶ 27, quoting *BedRoc Ltd., L.L.C. v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004), quoting *Connecticut Natl. Bank v. Germain*, 503 U.S. 249, 253-254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). And R.C. 3314.08(H) is plain and unambiguous: FTE is calculated by dividing the number of the hours of learning opportunities *offered* (or made available) to a student by the total hours of learning opportunities that are *offered* (or made available) to a student who attends for the entire school year, limited only by the ten-hour-a-day cap.

{¶ 93} Ironically, it is the majority that fails to consider the operable language of the statute in full; it reads one sentence in R.C. 3314.08(H)(3) in isolation and out of context without even scratching the surface of the whole statutory scheme of public-school funding. But a comprehensive review of that funding scheme reveals that all public schools—traditional public schools, brick-

and-mortar community schools, and e-schools—receive state education dollars based on enrollment. "[S]tate money follows the student," *Ohio Congress of Parents & Teachers* at ¶ 53, because the General Assembly intended to guarantee each public-school student a minimum level of education funding, i.e., his or her "own per-student allocation of state money," *id.* at ¶ 58. But under the guise of statutory construction, the majority upends state education policy, separating funding from the e-school student and rewarding the school district that failed to meet his or her needs—state education money no longer all follows the student to an e-school, and the school district gets the windfall of retaining part of the student's allocation without shouldering the burden to provide any services at all.

{¶ 94} Unmooring R.C. 3314.08(H)(3) from its context is therefore not just a faulty exercise of statutory construction; it has real-world consequences that arrive at the expense of the very students that the legislature sought to empower by providing an alternative to the traditional public schools that already failed them. There is simply no basis to believe that the General Assembly—solely by implication—set e-schools apart from all other public schools by basing funding on something other than the duration of enrollment, i.e., a student's active, online participation in learning.

{¶ 95} In the end, it is apparent that the majority believes that it is bad public policy to pay a school "merely for *offering* learning opportunities." (Emphasis sic.) Majority opinion at ¶ 22. However, "[t]he General Assembly is the branch of state government charged by the Ohio Constitution with making educational policy choices for the education of our state's children. Our personal choices are not relevant to this task." *Ohio Congress of Parents & Teachers*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 34.

{¶ 96} And the majority's view ignores reality. The General Assembly established community schools "to provide a *chance* of educational success for students who may be better served in their educational needs in alternative

settings." (Emphasis added.) *Id.* at ¶ 32. This includes students who have already failed in or dropped out of traditional public schools. *Id*. at ¶ 6. Like any school, an e-school can offer students only the *opportunity* to learn. It cannot force students to take that opportunity. Rather, it falls upon students, supported by their parents, guardians, and custodians and their schools, to participate in the learning opportunities offered by the school. And it is the effort of the student that will ultimately decide whether he or she advances and graduates. Because of the challenges that many students attending e-schools already face, such as high rates of mobility, poverty, and special needs, the majority effectively eviscerates the last chance for an education that many students attending an e-school will have.

**{¶ 97}** Given the complexities of public-school law, undoubtedly there will be unintended consequences arising from today's decision to give credit only for students' participation. For example, Ohio graduation requirements applicable to students in all public schools—traditional public schools, brick-and-mortar community schools, and e-schools—require a minimum number of hours of coursework in specified fields before a public school may award a diploma. R.C. 3313.603 and 3314.03(A)(11)(f). The majority's holding therefore casts doubt on whether students enrolled in ECOT and other e-schools are still on track to graduate if the school lacks data documenting when the student logged in and logged out of the online educational platform. After all, the logical consequence of the majority's analysis is that an e-school can establish a student's completion of a sufficient number of hours of coursework only by producing the same durational data required for funding purposes. It will be up to the General Assembly to pass new laws to make its education policies clear and to remedy this and other unforeseen results.

### Conclusion

**{¶ 98}** The General Assembly authorized the creation of community schools as a part of Ohio's constitutionally required system of common schools.

*Cordray v. Internatl. Preparatory School*, 128 Ohio St.3d 50, 2010-Ohio-6136, 941 N.E.2d 1170, ¶ 22. In establishing e-schools, the legislature sought to provide another option to students whose traditional public school had failed them. The majority may be correct that as a matter of policy, e-schools need to do more to ensure that students participate in the learning opportunities offered to them. The General Assembly, however, chose to hold community schools accountable in a different way: through sponsors who can suspend operations and parents who can withdraw their children from the school. *Ohio Congress of Parents & Teachers*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 31.

{¶ 99} Whether other measures are needed to hold e-schools accountable for how they spend state education funds is a matter for the General Assembly to address as the policymaking branch of state government. But even though it enacted legislation in 2015 requiring e-schools to "keep an accurate record of each individual student's participation in learning opportunities each day," R.C. 3314.27, it has not altered the basic framework of school funding, which is calculated based on the e-school's enrollment according to the principle that state education money follows the student when he or she enrolls in or withdraws from a public school. It is telling that the legislature addressed many of the concerns motivating this litigation—i.e., that e-schools should have to maintain records documenting student participation—without expressly linking state education funding to the duration of online participation.

{¶ 100} Notably, ODE previously agreed with a construction of the statute that funded e-schools based only on the schools' reported enrollment. It entered a funding agreement in January 2003 providing that state aid would be paid to ECOT based on its enrollment. Consistent with this agreement, between 2003 and 2015 ODE approved payments to ECOT based on enrollment and the hours of learning opportunities offered to the student as certified by teachers, without asking ECOT to report the number of hours a student had participated in learning opportunities.

Only in 2016 did ODE reject the established course of dealing of the parties and assert, for the first time, that state funding depends on the duration of online participation, not enrollment. No change in the statute or in the department's administrative rules required this action, and tellingly a bill seeking to codify ODE's position in this litigation failed to pass in the General Assembly. *See* 2017 S.B. No. 39 (as introduced). In this court, ODE fails to justify its after-the-fact position on how funding will be calculated.

{¶ 101} Nothing in R.C. Chapter 3314 indicates that the General Assembly intended to set e-schools apart from traditional public schools and other community schools and base an e-school's funding solely on how much time during the day that the student chooses to log onto the school's network and participate online in the education opportunities offered to the student. Rather, the plain language that the legislature enacted demonstrates that an e-school's funding depends on its enrollment.

{¶ 102} Accordingly, I would reverse the judgment of the Tenth District Court of Appeals and remand the case to the trial court for further proceedings consistent with this opinion.

––––––––––––––––

Zeiger, Tigges & Little, L.L.P., Marion H. Little Jr., John W. Zeiger, and Christopher J. Hogan, for appellant.

Organ Cole, L.L.P., Douglas R. Cole, Erik J. Clark, and Carrie M. Lymanstall, for appellee.

McNees, Wallace & Nurick, L.L.C., Karl H. Schneider, and Michael V. Passella, urging reversal for amicus curiae Ohio Coalition for Quality Education.

Murray, Murphy, Moul & Basil, L.L.P., Brian K. Murphy, and Joseph F. Murray, urging reversal for amici curiae former members of the Ohio General Assembly.

Day Ketterer, Ltd., Albin Bauer II, and Thomas C. Holmes, urging reversal for amici curiae Akron Digital Academy, Newark Digital Academy, Phoenix Academy Community School, and Quaker Digital Academy.

Joseph Schiavoni, Bethany E. Sanders, and Scott W. Stockman, urging affirmance for amici curiae members of the Ohio Senate and House of Representatives Democratic Caucuses.

_____